**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Criminal No.   20-CR-106 (RC)** |
| | : | |
| **LIRIM SYLEJMANI,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America hereby submits this sentencing memorandum for defendant Lirim Sylejmani ("Sylejmani" or "the defendant"). The parties have entered an agreement pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) and submit that a sentence of 120 months, lifetime supervised release and a special assessment of $100 is appropriate for Sylejmani's sole count of conviction – Count Three, Receiving Military-Type Training from a Foreign Terrorist Organization in violation of 18 U.S.C. § 2339D.  This sentence is consistent with the applicable Sentencing Guidelines, reflects the seriousness of Sylejmani's criminal conduct, and adheres to the factors in 18 U.S.C. § 3553(a).  The requested sentence would adequately serve the interests of justice and the government submits the following facts and authorities to support the recommendation.

**I.      Factual Background**

The Islamic State of Iraq and al- Sham, known as ISIS, is a designated foreign terrorist organization. Specifically, in 2004, the United States Secretary of State designated al Qaeda in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act (the "INA") and as a Specially Designated Global Terrorist under Section 1(b) of Executive Order 13224. In 2014, the Secretary

1

of State amended the designation of AQI as an FTO under Section 219 of the INA and as a Specially Designated Global Terrorist entity under Section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added a number of aliases to the FTO, including ISIS.  To date, ISIS remains a designated FTO and knowingly providing material support to ISIS is a federal crime.

Sylejmani is a naturalized American citizen,  born in Gjilan, Kosovo, on February 7, 1976. In approximately 2000, he moved to Chicago, Illinois, and thereafter, sought citizenship based on his refugee status arising from, according to his immigration file, "ethnic cleaning by Serbs."  The defendant subsequently became a naturalized United States citizen.  In approximately 2002, he began living with Polish citizen Karolina Katarzyna Suchojad and had several children with her. In the spring of 2011, he left the United States with his family and returned to Kosovo.  He and his family moved to Canada several months later, where they remained until 2015.  During his time in Canada, the defendant began to embrace Islam.

By the fall of 2014, the defendant began considering moving his family to join ISIS. Suchojad converted from Catholicism to Islam and reportedly agreed with the defendant's plan to join ISIS.  In May 2015, the family moved back to Kosovo.  In order to join ISIS, the defendant worked with an active ISIS member to receive Tazkiyah, or official vouching. Thereafter, the defendant surrendered to that ISIS member the United States passports issued for him and his family and received false Syrian identification documents to use for travel to join ISIS. The defendant was then connected with a smuggler who helped him and his family enter Syria and join ISIS.  In early November 2015, the family flew to Istanbul, Turkey, and ultimately crossed the Turkish-Syrian border to join ISIS.

Beginning in January 2016, the defendant communicated with his Kosovo-based sister, using Viber and then Surespot.  In mid-January 2016, the defendant told his sister that he and his family were "in the Islamic State." When his sister asked whether he was working there, the defendant responded, "No not for the moment …. I had some training to finish and now I am looking."  His sister asked, "Are you in the war zone … Or in another state." The defendant replied, "Now close to Mosul."  When his sister asked if the defendant was satisfied there, the defendant responded, "I have never been happier." Although his sister asked the defendant to return to Kosovo with his family "before something bad happens," the defendant replied, "Don't worry because you will change nothing.  Pray to Allah and hope to meet one day when the world will be free from the infidels."

Shortly after entering Syria, the defendant completed his ISIS intake process at an ISIS guesthouse. He took on the name Abu Sulayman al-Kosovi and began initial entry training with other ISIS recruits on approximately November 22, 2015.  The defendant, his family, and other ISIS recruits moved to Mosul, Iraq, in late November 2015. In December 2015, the defendant began his ISIS military and Sharia[1] law training.  Before graduating from ISIS military training in mid-December 2015, the defendant pledged "bayat," or allegiance, to the leader of ISIS and to ISIS as an organization.

Upon completion of his military training, the defendant was assigned to the ISIS battalion in Mosul, Iraq, and was issued his own AK-47, four AK-47 magazines, a belt to hold the magazines and two grenades.  In the spring of 2016, the defendant was paid by the ISIS administrative officer in Iraqi Dinar for his first three months of service.  In May of 2016, the defendant reported for

---

[1] "Sharia" is a body of religious law of Islam.  It constitutes a system of duties that are incumbent upon all Muslims by virtue of their religious belief.

guard duty, called "ribat," on the front line of a military operation undertaken by the Syrian Defense Forces ("SDF") against ISIS at the city of Manbij, Syria. He continued to serve as a fighter for ISIS until he was injured in a battle with Coalition Forces in June 2016. After recovering from his wounds, the defendant was eventually reassigned to a new battalion in the fall of 2017 and was paid for his services during that time.

Between November 2017 and February 2019, the defendant and his family moved southeast to Baghouz, Syria, as the territorial Caliphate of ISIS collapsed. On February 27, 2019, the defendant and his family were captured by Coalition Forces in Baghouz. The defendant was then incarcerated by the SDF in Syria at the Dashisha prison from approximately late February 2019 to May of 2019, and then transferred to the Al-Hasakkah prison where he remained until he was transferred to United States law enforcement personnel on September 15, 2020, to face criminal charges in this District.

After his capture on February 27, 2019, through his transfer to U.S. custody on September 15, 2020, Sylejmani made several relevant statements about his time in ISIS and the duties he performed for them.

On March 31, 2019, while incarcerated at Dashisha prison, the defendant was biometrically enrolled by FBI Special Agents. According to the agents, Sylejmani voluntarily answered questions which generally consisted of whether he was aware of any imminent threats to SDF or Coalition Forces or attacks against the United States or Western countries. Sylejmani further advised that he was unaware of any impending operations by members of ISIS in Iraq or Syria, nor was he aware of any American hostages or hostages of any other nationality. Sylejmani also provided information about the date he arrived in Syria, that he swore allegiance to ISIS and information about his role in ISIS as a civil engineer.

On April 16, 2019, Sylejmani was interviewed by journalist Robin Wright of *The New Yorker* while detained at the Dashisha prison.  According to the article ("The Dangerous Dregs of ISIS"),[2] Sylejmani was interviewed in a "makeshift office" at the prison with his hands cuffed in the back.  Robin Wright, *The Dangerous Dregs of Isis,* The New Yorker, April 16, 2019, at 4. Included in the article is a photograph of Sylejmani seated on a rug with an individual who appears to be a guard standing next to him.  *Id.*  As reported in the article, Sylejmani admitted to having joined ISIS, and claimed that he wanted to live under Sharia law.  *Id.* at 4-5.  Sylejmani further admitted to having received military training in Iraq, where he learned how to operate an AK-47 automatic rifle but claimed that he never fought.  *Id.* at 6.

*Exhibit A: Snippet from The Dangerous Dregs of ISIS*

"I shot about twenty bullets when I was doing the training in Mosul. And I shot one bullet in a house, by accident, in the ceiling. That's as much fighting as I did," Sulejmani insisted. "I carried the gun since the first day when I came to Dar al-Islamiyyah [House of Islam] until I left Baghouz. Towards the end it was rusted, but my goal wasn't to come fight. It was making hegira. I was pushed a certain way, which I went. I liked to give it a try. It just didn't work." He shrugged.

On April 21, 2019, approximately three weeks after his initial biometric interview with the FBI, Sylejmani was again interviewed by the FBI at the Dashisha prison. He was advised of his rights, both orally and in writing, in English, his preferred language.  After the agents read the Advice of Rights form to him, Sylejmani confirmed that he understood the rights as described on the form and signed the form, acknowledging that he wished to speak with the agents without having an attorney present.

---

[2] Available at: *https://www.newyorker.com/news/dispatch/the-dangerous-dregs-of-isis*

During this interview, Sylejmani admitted to being a member of ISIS, and advised that his Kunya[3] was "Abu Sulayman Al-Kosovi."  He further admitted that he was aware that ISIS was a terrorist organization that engaged in beheadings of American citizens.  Sylejmani provided background information and a timeline from living in the United States in 2007 to his move to Kosovo in 2011.  Sylejmani discussed that he and his family moved to Canada in the fall of 2011 and would return to the U.S. every six months for a day or two to reapply for his Canadian work permit.  Sylejmani also discussed his turn toward Islam after his father's death in 2012 and stated that he eventually found ISIS videos in 2014 regarding life in the Islamic State and saw Albanians in some of these videos.  Sylejmani described how, in 2015, he and his family moved back to Kosovo from Canada, during which time Sylejmani learned how to pray at home and he began attending a mosque.  Sylejmani also described how, in 2015, he arranged to have himself and his family smuggled into Syria through Turkey in order to join ISIS.

In the April 21, 2019, interview Sylejmani also discussed his training with ISIS, admitting that the training included 21 days of Sharia and military training in Mosul, Iraq.  Sylejmani advised that military training included classroom instruction on firearms and that each ISIS recruit was issued an AK-47 rifle.  Sylejmani was trained on how to use the AK-47, including practice firing the weapon.  He advised that he also received training on other weapons, including rocket propelled grenades (RPGs).  Towards the end of military training, each recruit, including Sylejmani, was called forward to pledge bayat to ISIS leader Abu Bakr Al-Baghdadi and ISIS. After completion of the training, Sylejmani stated that he was issued an AK-47 rifle, AK-47 ammunition magazines and two grenades.  Sylejmani was ultimately assigned to the Tariq bin Ziyad Battalion, which was split with half of the battalion fighting in Ramadi, Iraq, and the other

---

3 A kunya is an honorific name in Arabic culture, highlighting an individual's role as a parent, typically derived from the name of the person's first-born son or daughter.

half stationed in Tall Kayf, Iraq. Sylejmani was initially stationed in Tall Kayf. Sylejmani admitted that while he was in Mosul, he maintained contact with his family in Kosovo, including his sister, via a communications application called Viber. Sylejmani stated that his family was aware that he had joined ISIS. Sylejmani discussed with the FBI his various roles supporting ISIS in several locations in Syria before his capture, including his assignment to ribat positions on the front line during SDF's offensive in Manbij, Syria. Sylejmani claimed that in 2016, he received shrapnel wounds to his legs, which required treatment at a hospital. He identified himself in a video recorded in Manbij and provided details about the Albanian Battalion of ISIS fighters.

During the interview, the agents informed Sylejmani that his interview with *The New Yorker* had been published and asked Sylejmani if there were any sections of the article where his words or actions were not represented accurately. Sylejmani replied that there were two inaccuracies. Sylejmani claimed that he never told the reporter that his wife had contacts in Canada and that he never told the reporter when asked about joining ISIS, "I liked to give it a try. It just



didn't work out." Agents asked Sylejmani if the rest of the article was accurate and whether he would accept the article as his own statement, and Sylejmani agreed. Sylejmani was asked to box off the section that was read to him, initial each page of the article that was read to him, and sign and date the article. Sylejmani initialed each page, signed and dated the article and wrote "Tru Statement."

*Exhibit B: Snippet from New Yorker article signed by Sylejmani*

During the interview, Ms. Wright asked Sylejmani if given the chance to live in another caliphate, would he do it again. Sylejmani responded, "I would. For me, at this point, everything is religious. This world, sooner or later, will end, like it ends for everybody. For me, it's important what comes after." He continued to state, "We all die. My belief is that we're put in this world to worship Allah. So, *Inshallah*, there will be Jinah, or paradise, after it." When asked why he hadn't become a martyr, Sylejmani responded, "I like life. I did not come to die here. I came to live under Sharia. I mean, it was open enrollment." When Ms. Wright asked Sylejmani if there will be enough people who believe that creating a new caliphate is still worth it, Sylejmani replied, "I believe so."

Between approximately September 2019 and February 2020, while detained at the Dashisha prison, Sylejmani provided interviews to four additional media outlets, including CBS News, the Defense Post, National Public Radio (NPR) and ABC News. During those interviews, Sylejmani's statements were generally consistent with the admissions he made in *The New Yorker* article, to wit, that he was a member of ISIS.[4] When interviewed by CBS News correspondent Holly Williams, Sylejmani stated that he is American and that he left his home in Chicago to live under ISIS in 2015. Ms. Williams characterized Sylejmani as "unrepentant," quoting him as

---

[4] See James Longman, *Caliphate wives share their stories year after ISIS defeat: Reporter's Notebook*, ABC News, Feb. 19, 2020, https://abcnews.go.com/International/caliphate-wives-share-stories-year-isis-defeat-reporters/story?id=69055474; Jane Arraf, *Visiting Imprisoned ISIS Fighters*, National Public Radio, Dec. 8, 2019, https://www.npr.org/2019/12/08/786039731/visiting-imprisoned-isis-fighter; Jared Szuba, *U.S. citizen ISIS member wants to know why he can't go home*, The Defense Post, Nov. 19, 2019, https://www.thedefensepost.com/2019/11/19/us-citizen-isis-syria-lirim-sulejmani/; Holly Williams, *ISIS suspects in overcrowded Syrian prison tell CBS News they're Americans -Inside a prison full of alleged ISIS fighters*, CBS News, September 17, 2019; https://www.cbsnews.com/news/isis-suspects-in-overcrowded-syria-prison-tell-cbs-news-theyre-american-sdf-says-needs-help-2019-09-17/.

saying, "[t]he choices that I made, in somebody's eyes, the wrong choice, so I face jail time."  He did not believe that he made the wrong decision, saying he "just wanted to live under Islamic law."  According to ABC News correspondent James Longman, Sylejmani was relaxed, "almost nonchalant about his time in ISIS."  While Sylejmani said that he regrets his time in ISIS, Mr. Longman did not sense remorse.  Sylejmani was quoted as saying, "I have regrets and I don't have regrets."  He explained that he was "making Hijra" to ISIS and said that ISIS was a legitimate religious state.  Sylejmani is quoted as saying, "When you say 'ISIS,' it's like 'Islamic State.'  For me, it's a place ruled under Sharia law.  I wanted to live under Islamic law..."  He continued to explain what this would mean to him, saying, "Somebody cheats and admits that, or he has four witnesses, he's going to be stoned for it.  That's the way it is – there's nothing for me to agree or not agree.  I just go blindly by Sharia.  I don't have that much knowledge.  I fully support it."

On September 15, 2020, Sylejmani was taken into custody by the FBI and transported via airlift back to the United States.  While on the plane, FBI agents gave him his *Miranda* warnings again, which he voluntarily waived and then interviewed him. The agents asked Sylejmani about his statements to multiple media outlets, including ABC News, CBS News, the Defense Post and NPR.  For each report, the agents played for Sylejmani a video or audio of the interview or read him the article.  In each instance, Sylejmani acknowledged that he recalled providing the interview.  Agents also asked whether there were any inaccuracies in any of the statements or articles he reviewed.  Sylejmani noted a few minor corrections or clarifications, but at no time did he retract his admissions that he had joined ISIS or that he had received military training.

## II.    **Procedural History**

On July 7, 2020, a federal grand jury returned a three-count indictment against the defendant, charging him with the following: one count of Conspiracy to  Provide Material Support

or Resources to a Designated Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B (Count 1); one count of Providing or Attempting to Provide Material Support or Resources to a Designated Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B (Count 2); and one count of Receiving Military-Type Training from a Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339D (Count 3). ECF No. 1.

On December 12, 2024, Sylejmani pled guilty pursuant to a plea agreement to Count Three of the Indictment. ECF No. 82. Pursuant to Rule 11(c)(1)(C), the agreement contemplates a sentence of ten years incarceration followed by a lifetime term of supervised release, as agreed to by the parties. ECF No. 82, ¶ 4. The sentencing hearing is set for April 24, 2025.

### III.    Statutory Penalties

A violation of 18 U.S.C. § 2339D  carries a term of 10 years of imprisonment, a fine of up to $250,000 pursuant to 18 U.S.C. § 3571(b)(3), or both.  A maximum of a lifetime of supervised release, pursuant to 18 U.S.C. § 3483(j), may also be imposed.

### IV.    Applicable Sentencing Guidelines

The government agrees with the guidelines calculations from the presentence report, and has noted no corrections to those calculations. ECF No. 90, ¶ 33- 44. Count Three is a felony offense for which no guideline has been promulgated.  Pursuant to U.S.S.G. §§ 1B1.2(a) and 2X5.1, the most analogous guideline should be used.  As Count Three involves the defendant joining a terrorist organization  that provided him military-type training, U.S.S.G. § 2M5.3 is the most analogous guideline.

The guideline for a violation of 18 U.S.C.  § 2339D is therefore § 2M5.3, which establishes a base offense level of 26. Because the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, the offense level is increased by 12 levels. U.S.S.G.

§3A1.4(a). There are no other specific offense characteristics that add or subtract from the base offense level.

| | |
|---|---|
| **Base Offense Level**: | 26 |
| **Specific Offense Characteristics**: | 0 |
| **Victim Related Adjustment:** | +12 |
| **Acceptance of Responsibility**: | -3 |
| **Total Offense Level**: | 35 |

The defendant has no criminal convictions. However, based on application of the terrorism enhancement pursuant to U.S.S.G. § 3A1.4(b), the defendant's criminal history category is mandated to be Category VI.

The defendant is not eligible for an adjustment pursuant to U.S.S.G. § 4C1.1 because he may be subject to an enhancement under U.S.S.G. § 3A1.4. *See* U.S.S.G. **§** 4C1.1(a)(2).

The applicable guideline range for an Offense Level 35 and Criminal History Category VI is 292-365 months, which is above the statutory maximum. The statutory sentence is 120 months. Accordingly, the defendant's estimated sentencing range is 120 months. *See* U.S.S.G. § 5G1.1. Should the Court impose a fine, the estimated applicable fine range is $0 to $250,000.

## V.    Sentencing Factors Under 18 U.S.C. 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.  The Nature and Circumstances of the Offense

The nature and circumstances of the offense are quite serious. ISIS is a group that has conducted and inspired brutal terrorist attacks worldwide since the early 2000s and continues to

11

engage in and promote acts of terrorism in the U.S. and abroad.[5]  In 2019, an international coalition ejected ISIS from its last stronghold in Syria, although the group continues to operate clandestinely there and in Iraq.[6] Despite losing many of its leaders and its territory, ISIS remains capable of conducting insurgent operations in Iraq and Syria while overseeing at least 19 branches and networks in Africa, Asia, and Europe. Most troubling here, ISIS encourages adherents worldwide to conduct operations in their own countries using readily available weapons and has previously deployed operatives abroad to execute attacks.[7]  It makes substantial use of social media to recruit supporters and encourage individuals from around the world to travel to ISIS strongholds to fight for the caliphate.

Sylejmani chose to join ISIS, knowing that the group used weapons and violence to implement its vision. Specifically, Sylejmani was trained by one of the world's most lethal organizations on how to use those weapons for the benefit of the caliphate, which is dedicated to the destruction of the United States and its allies. For years before he was smuggled into Syria, Sylejmani contemplated joining ISIS. In 2015, he finally moved his whole family, including his young children, Isabela and Hana to an active war zone in order to do so. He also had a son, Elias, while he and his family were with ISIS in Syria. He  trained on how to use the AK-47 rifle assigned to him as a member of his battalion. He was injured in a battle against Syrian Defense Forces. After recovering from his battle injuries, he spent the years from the middle of 2016 until his capture in early 2019 living and working in Iraqi and Syrian territory subjugated by ISIS to become its caliphate. The nature and circumstances of the offense are not mere crimes committed on a

---

[5] https://www.dni.gov/nctc/ftos/isis_fto.html#:~:text=ISIS%20mostly%20attacks%20military%20targets,its%20interpretation%20of%20Islamic%20law.
[6] *Id.*
[7] https://www.dni.gov/nctc/ftos/isis_fto.html#:~:text=ISIS%20mostly%20attacks%20military%20targets,its%20interpretation%20of%20Islamic%20law.

whim; they are the result of years of planning and calculating, and  remaining committed to a savage terrorist organization for years after he was injured in battle.

### B.  The History and Characteristics of the Defendant

Although the defendant has no criminal history, his first criminal conviction was not merely a crime of opportunity, but one that required great thought and careful execution. The conduct is far more than a single, impulsive act. He chose to jeopardize the safety of his family by bringing them to a war-torn country to join and take up arms for ISIS.

The history and characteristics of the defendant provide little mitigation for his conduct. Sylejmani grew up in a middle-class home in Kosovo, where his parents provided well for him and his siblings. See ECF No. 90, ¶ 55-56. He studied civil engineering at the university level in Kosovo and was among the top students in his class.  See ECF No. 90, ¶ 57. He and his family fled Kosovo during the war in 1999 and sought asylum in the United States. See ECF No. 90, ¶ 58. He became a naturalized citizen and lived with family in Illinois for many years.   He is an intelligent, educated individual who knew what living in a war zone would be like, as his family sought asylum in the United States as a sanctuary to escape such conditions.  He became a United States citizen, taking a vow to uphold the Constitution and preserve the United States.  While it is true that Sylejmani suffered great loss when his five-year-old daughter passed away, that does not excuse his conscious decision to move his family to Syria to take up arms for an organization committed to the  destruction of his adopted country, the United States.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment

The defendant's sentence must promote respect for the law. The Supreme Court has recognized combating terrorism as "an urgent objective of the highest order." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010). Sylejmani trained with and fought on behalf of

one of the world's most violent terrorism groups that has targeted U.S. and coalition forces for years, as well as the civilians of Syria and Iraq. Just punishment and respect for the law compel a sentence as significant as the decision Sylejmani made to leave his home with his wife and young children to join a foreign terrorist organization and fight against the United States and its allies.

### D.  The Need for Adequate Deterrence

#### 1.  *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving terrorism, which the defendant's actions in support of ISIS certainly was. The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case in which a defendant provides material support to ISIS. As noted in the Probation Office's recommendation, crimes of this nature cause significant societal harm, including increased security threats, as the type of military training the defendant received can fuel radicalization and recruitment, encouraging others to follow the same path. This type of training also creates a threat to people living in the United States, since ISIS has encouraged its supporters to engage in jihad domestically if they cannot travel to the territory of the caliphate. Unfortunately, ISIS inspired terror attacks continue to occur in the United States.[8] The sentence of this Court must demonstrate to those considering supporting a foreign terrorist organization that heavy penalties come with such serious criminal acts.

#### 2.  *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. A just sentence must protect the public

---

[8] https://www.cnn.com/us/live-news/new-orleans-mass-casualty-bourbon-street-01-01-25-hnk/index.html

from further crimes of the defendant. The impulse to leave one's naturalized home country and join an organization dedicated to its downfall does not emerge overnight and does not leave quietly. *See United States v. Meskini*, 319 F.3d 88, 91-92 (2d Cir. 2003) ("'[A]n act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus . . . terrorists and their supporters should be incapacitated for a longer period of time.'"). The defendant must know by this Court's sentence that such acts of terrorism will not be tolerated.

While the defendant has accepted responsibility for his actions, his adherence to the violent beliefs that brought him to Syria to fight for ISIS is highly disturbing.  Far more important than anything he may say now, when he is facing sentencing, are Sylejmani's own statements, discussed above, when he was expressing himself freely. These statements demonstrate that this defendant's sentence must be sufficient to provide specific deterrence from ever again using or promoting the use of weapons or violence in pursuit of his ideological goals.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18

U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

## VI.    Conclusion

For all these reasons, the United States respectfully asks this Court to sentence Sylejmani to a term of imprisonment of 120 months, followed by a lifetime term of supervised release.

Respectfully submitted,

EDWARD R. MARTIN
UNITED STATES ATTORNEY
D.C. Bar No. 481866


By:    */s/ Steven B. Wasserman*
Steven B. Wasserman
D.C. Bar No. 453251
Kimberly L. Paschall
D.C. Bar No. 1015665
Assistant United States Attorneys
National Security Section

16

601 D Street, N.W.
Washington, D.C. 20530
(202) 272-7719 -Wasserman
(202)-252-2650 - Paschall
Steve.Wasserman@usdoj.gov
Kimberly.Paschall@usdoj.gov


_/s/Jennifer E. Levy_____
Jennifer E. Levy
D.C. Bar No. 291070
Trial Attorney
Counterterrorism Section
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
(202) 514-1092
Jennifer.E.Levy@usdoj.gov


<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing pleading has been served upon Ubong Akpan and Sabrina Shroff, counsel for defendant via the electronic case filing system, this 7th day of April 2025.


_/s/Steven Wasserman_____
STEVEN B. WASSERMAN
Assistant United States Attorney

17