UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---------------------------------------------------------x
UNITED STATES OF AMERICA         :
                                 :
        v.                       :
                                 :   Crim. Action No. 20-106 (RC)
LIRIM SYLEJMANI,                 :
                                 :
        Defendant.               :
---------------------------------------------------------x

**LIRIM SYLEJMANI'S MEMORANDUM IN AID OF SENTENCING**

Mr. Sylejmani has pled guilty pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) to one count of receiving military-type training from a foreign terrorist organization (ISIS) in violation of 18 U.S.C. § 2339D.[1] The government and Department of Probation both agree that the Plea Agreement's required sentence – ten years (120 months); lifetime supervised release; and a $100 special assessment – falls within the range of a reasonable sentence and "is consistent with the applicable Sentencing Guidelines, reflects the seriousness of Mr. Sylejmani's criminal conduct, and adheres to the factors in 18 U.S.C. § 3553(a)." Govt. Sentencing Mem. [ECF Doc. No. 92] at 1; *accord* Dept. of Probation Sentencing Recommendation [ECF Doc. No. 91] at 1-2.[2] In turn, this sentencing memorandum reviews for the Court those facts that explain why the sentence stated in the plea agreement should be imposed by the Court. For the reasons

---

[1] In pertinent part, 18 U.S.C. § 2339D provides: "Whoever knowingly receives military-type training from or on behalf of any organization designated at the time of the training by the Secretary of State under section 219(a)(1) of the Immigration and Nationality Act as a foreign terrorist organization shall be fined under this title or imprisoned for ten years, or both."

[2] This Court is not in need of any extended briefing of the federal sentencing scheme. It knows that (i) the sentencing guidelines "are truly advisory" (*United States v. Dorvee*, 616 F.3d 174, 182-3 (2d Cir. 2010); (ii) the sentence must "fit the offender and not merely the crime" (*Pepper v. United States*, 562 U.S. 476, 487-88 (2011)), (iii) the Court must conduct its own "individualized assessment based on the facts presented" (*Gall v. United States*, 552 U.S. 38, 50 (2007)); and (iv) the Court must impose the shortest sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of criminal sentencing (18 U.S.C. § 3553(a)).

1

below, Mr. Sylejmani respectfully joins the government and the Department of Probation in asking that he be sentenced to no greater than ten years in prison followed by lifetime supervision, as stated in the plea.

## DISCUSSION

Mr. Sylejmani joining ISIS in 2015 is an extremely serious offense. The Court, however, is charged with sentencing the Lirim Sylejmani of 2025, not the one of 2015. It is the "most up-to-date picture of [Mr. Sylejmani's] history and characteristics" that should be treated as fundamental (*Pepper v. United States*, 562 U.S. 476, 477 (2011)) and is "the most probative [sentencing] information available" (*United States v. Rose*, 379 F.Supp.3d 223, 233-234 (S.D.N.Y. 2019)). Mr. Sylejmani is not a committed jihadist – not then, and certainly not now. He never believed in, or espoused, radical violent jihad, and he poses no threat of any kind to others. He is guilt ridden for his actions and the harm he has visited on his family, who remain detained in a refugee camp in Syria living under terrible conditions. He wishes only to complete his time and find his wife and children, so he can live an average law-abiding life with them.

Lirim's offense was the culmination of a series of tragedies and obstacles in Mr. Sylejmani's personal life that made him susceptible to the brainwashing and propaganda promise of a "perfect Caliphate State" proffered by radical Islam and ISIS in the 2010s. At a particularly troubled time in his life, he, as people often do, turned to the comfort of religion, in this case to his family's Muslim faith. His family had not been particularly religious and, as he tried to learn how to worship and live as a good Muslim, he fell for the skilled propaganda of radical Islam. Misled, and believing that being a good Muslim required that he live in a religious state, he moved with his family to Syria in 2015. He soon realized his error, but by then it was too late. ISIS controlled everything, and to refuse to cooperate with ISIS on certain matters was to risk

2

yourself and your family. So, Mr. Sylejmani underwent training, and then spent his time and energy trying to take care of his family and keep them, and himself, away from battle.

In 2019, Mr. Sylejmani surrendered to Kurdish SDF forces. While his wife and three children were sent to a refugee camp in Syria, where they remain to this day, he was placed in an SDF prison and, almost two years later, was repatriated to the United States to face prosecution. Having pled guilty in a timely manner pursuant to a Fed. R. Crim. P. 11(c)(1)(C) plea agreement, Mr. Sylejmani now stands before the Court for sentencing.

**Lyrim Sylejmani's Early Life in Kosovo**

Lirim Sylejmani is 49 years old. He was born in Gjilian, Kosovo, when it was still part of the Republic of Yugoslavia. Presentence Investigation Report ("PSR") ¶ 54. His father, Raif Sylejmani, was an accounting secretary; his mother, Hidajete Sylejmani, was a housewife. *Id.* He has three sisters and a brother, all of whom have cut ties with him because of his offense. *Id.* ¶ 55. Mr. Sylejmani grew up "middle class" and mostly happy. While his family "didn't have everything," they were never hungry or wanting for necessities. *Id.*

Lirim's family was Muslim, but did not practice their religion. His father, Raif, for example, regularly drank alcohol despite it being proscribed for Muslims. PSR ¶ 73. Raif was very strict and controlling, and often verbally and emotionally abusive toward his wife and children, especially his two sons. He pushed his children, particularly Lirim, hard to succeed and to obey. *Id.* ¶ 56. Raif "was very critical of Lirim and was quick to berate him for any small mistake or for not living up to his expectations which were nothing short of perfection – it had to be perfect." Letter from Lirim's cousin, Ramadan Suleymani, to Court ("Ramadan Letter") at 4 (attached hereto as **Exhibit A**). Mr. Sylejmani responded to this pressure by working hard and being an excellent student, particularly in mathematics. PSR ¶ 56. He remained closest to his

mother, and it was for her that he persevered in his education.

Lirim's dream was to be an engineer. Ramadan Letter at 2. After high school, Mr. Sylejmani moved to Pristina, Kosovo, to attend the University of Pristina. There, he studied civil engineering for five years, continuing to achieve high marks and being recognized as the top student in his class. *Id.* at 2; PSR ¶ 57. Lirim appeared well on his way to achieving his dream of becoming an engineer when the former Yugoslavia erupted into civil war.

**The War in Kosovo and**
**<u>Asylum in the United States</u>**

By March 1999, the small conflicts dotting the former provinces had become a full-blown civil war. Lirim had been set to graduate in June of that year, but the intensity of the war led to the University closing. PSR ¶ 58. Lirim could not take his final exams or earn his degree. *Id.* In April 1999, 20 distant members of Mr. Sylejmani's family were killed in a massacre in the village of LLashtica. Ramadan Letter at 3. In response, Lirim's father decided to split the family up, and Lirim, his mother, and two of his sisters, were forced to leave Kosovo and live in the Stankovec Refugee Camp in Macedonia. *Id.*; PSR ¶ 58. Five months later, they family was reunited and granted asylum in the United States. *Id.* They moved to Bristol, Illinois in Fall 1999, where they lived with Lirim's uncle and his cousins, including Ramadan. *Id.*

Shortly after the family arrived in Illinois, Hidajete was diagnosed with lymphoma, and she passed away a short time later in April 2000. PSR ¶ 58. Her death was hard on Lirim. He had been very close with his mother, who had been as loving and warm as his father was strict and cold. *Id.* ¶ 55. Ramadan adds:

> This [his mother's death] was a tremendous blow to Lirim. He had lost his life as a student. He had been forced to leave his home and live in a refugee camp. The emotional downs he had to endure for the last two years took a toll on the man's mind and heart. I personally feel that him not being to complete his degree because of the war in Kosovo was devastating for him. He had dedicated so much study and hard work to his studies. Even the psychological traumas of the war in

4

> Kosovo did not distract him from his studies. He had endured it all and nevertheless lost his degree to war. Losing his mother not long after finally getting a new start in America had a silent impact on him.

Ramadan Letter at 3.

Upon arriving in America, Lirim began working at grocery stores and similar jobs, often two jobs at the same time, while thinking about going back to school. Ramdan Letter at 4. All the money he made went back to his father, who gave Lirim a small allowance to live on. *Id.*

**<u>Lirim and Karolina and Their Daughter's Death from Cancer</u>**

In 2002, Lirim met Karolina Katarzyna Suchojad, a Polish citizen living in Chicago, and they quickly fell in love. Ramadan Letter at 4. Lirim's father, and much of the family, rejected Karolina because she was Polish, but Lirim was determined that she would be his wife. *Id.* In 2003, Lirim and Karolina had their first child, Eliza. Lirim's father was furious about it but, again, Lirim was determined to live his own life. *Id.* Things finally seemed to be going right for Lirim. He had a wife that he loved, a beautiful daughter, they purchased a condo in Northbrook, Illinois in a good school district, and he started attending classes at the University of Illinois, Chicago, to finally finish his degree that had been interrupted by war. *Id.*; PSR ¶ 59.

In 2007, Eliza was diagnosed with advanced Stage IV neuroblastoma cancer. PSR ¶ 59. Eliza's battle with cancer, a battle that ended with her death at just five years old, devastated Mr. Sylejmani. As Ramadan relates:

> I personally helped Lirim fill Eliza's grave with dirt, shovel by shovel, as is custom in our culture. I do not think I ever saw a person that broken. He had aged before my face, and I just did not have any ability to comfort him. No father should outlive their child, he kept saying out loud and to no one in particular.

> Lirim was never the same after Eliza died. I would go and stay with them for a few hours on the weekends. He spent most of his time watching videos of his daughter and speaking about her nonstop. He drank, which was unusual for him, and even though we were in the same room, he might as well have been on Mars.

5

Ramadan Letter at 5.

Lirim had stopped going to the University of Illinois while still short of a degree, so he could spend as much time as he could with Eliza at Ronald McDonald House and Comers Kids Hospital. *See* PSR ¶ 74. And then he was laid off from his job. *Id.* ¶ 78. Lirim fell into a deep depression. He blamed himself for his daughter's death. He kept thinking of the small signs of cancer he had missed, and how we could have saved Eliza.

**Lirim and Karolina Move to Kosovo**
**and Canada to Try to Start Over**

Desperate and depressed, Lirim and Karolina decided to make a radical change. They hoped that leaving the United States and changing their environment would help them forget, or at least lessen the pain of, their memories of their daughter. *See* Ramadan Letter at 5 (Lirim "had to get out of Illinois as he could not get through a day without talking about Eliza."). They left Illinois and moved to Kosovo, but after a few months realized that leaving America did not mean they could leave behind the pain of losing Eliza. They wanted to return to America, but Karolina had no immigration status there, and she could not return.

Lirim landed a job as a land surveyor with good prospects for advancement and a chance to finally use the skills he had studied in college. The family followed his job to various places in Canada – Toronto, British Colombia, Alberta – and they were blessed with two daughters. Ramadan Letter at 5. The pain of losing Eliza remained, however, and Lirim began reading the Quran and looking into religion to try to understand his loss. Then, Lirim's skilled worker program ended, and his Canadian work permit could not be renewed. *Id.* Still unable to return to the United States, the family moved to Kosovo once more. *Id.* By this time, Lirim's father, Raif, had died from complications during a heart procedure (PSR ¶ 53), and Lirim went back to Kosovo, to an apartment his father had left for him in his will. Ramadan Letter at 5.

6

Things did not work out for Lirim in Kosovo. Echoing his father, many of his family were very cold and rude to him and Karolina because she was Polish. Ramadan Letter at 5. In addition, Blerin, Lirim's brother, did not want to share the two-unit apartment with Lirim. Blerin wanted Raef's entire apartment for his immediate family. To get it, he made Lirim and his family feel even more unwelcome. *Id.* It soon became apparent the Sylejmanis would have to move again and, with Canada and the United States not an option, Lirim, somewhat desperately, chose Syria.

**The Offense Conduct**

By this time, Lirim had decided he wanted to be a good religious Muslim, but he had no real family background in how to be one. He joined a Mosque to start learning how to pray, and he also researched religious practice on the Internet. In both places, he was exposed to radical Islamist propaganda. These videos, which Lirim now understands was pure propaganda, pushed how Muslims should live according to Islamic law. According to these videos, ISIS was helping Syrian Muslims, and those videos called upon Muslims to immigrate to this "blessed" land. Video showed Syrian markets and stores full of goods, happy children eating ice cream and playing in amusement parks, classrooms with kids learning how to read and write Arabic. The propaganda informed that being a good Muslim required one to live in a religious state.

Attached hereto as **Exhibit B** is the Statement of Aymenn Jawad Al-Tamimi ("Al-Tamimi Statement"), a researcher and expert on the Islamic State.[3] He confirms that the "very

---

[3] Mr. Al-Tamimi is fluent in Arabic and has a doctorate from Swansea Universtity in Wales where he focused on the role of historical narratives in Islamic State propaganda. His main areas of research include Iraq, Syria, the Islamic State, and global jihadism. Al-Tamimi Statement ¶¶ 1-4. He is a research fellow at the Middle East Forum and the Rubin Center at IDC Herzliya. *Id.* ¶ 6. He has published multiple journal articles on the Islamic State and jihadist terrorism, testified before the UK parliamentary committees on the Syrian Civil War, and testified as an expert on ISIS in *United States v. Musaibli*, 18 Cr. 20495 (Michigan), and as an expert witness on ISIS membership, salaries and financing in a UK terrorism financing case. *Id.* ¶¶ 9-11.

7

many videos and photos [ISIS] put out in this period of 2014-2015 also aimed to illustrate a 'utopia' aspect to the Caliphate in which Muslims were supposedly happy and prospering." Al-Tamimi Statement ¶ 17; *see also id.* ¶¶ 18-19 (providing concrete examples of this "utopian propaganda"). Many of those who migrated to Syria (performed "hijra") did so because they were urged to come and contribute to the building and protection of the Islamic Caliphate project "by using their professional skills (e.g. as doctors or engineers) to improve services and infrastructure within the Caliphate, rearing children as part of the next generation of the Caliphate's citizens and fighters, and joining a 'utopia' far removed from the supposed misery and oppression of the 'abodes of disbelief.'" *Id.* ¶ 20.

Lirim fell for it. Believing that moving to Iraq/Syria would provide a real opportunity to work as an engineer, and that his family would be happier there than in Kosovo, he convinced Karolina to give it a try.

Lirim soon realized the promises did not match the reality. Life in the Islamic State was not as he had expected, but by then it was too late. On day one, he was separated from his family and the only time he would see them was when they were moved between places. Questioning anything likely would bring accusations of being a mole and could result in execution, and ISIS's "policy with regards to people potentially leaving the Caliphate was that leaving for good was forbidden". Al-Tamimi Statement ¶ 21. There was no safe way for Lirim to escape with his family. They were trapped in a prison within the borders of the Islamic State, and ISIS controlled every activity. *Id.* ¶ 22. His main goal was to provide food for his family by any means, while moving them constantly away from zones where fighting was taking place. For the three and a half years Lirim and his family were under ISIS control, their lives were a hardship that only got worse over time.

Once in the Islamic State, Mr. Sylejmani was transported by himself to Kosovo where he underwent 21 days of training. PSR ¶¶ 17. He was then moved with his family to Tall Kayf, Iraq, and then to Manbij, Syria, where his boy, E.S., was born. *Id.* ¶¶ 18-21. In Manbij, Lirim was required to perform guard duty and, during his first and only fight with Coalition forces, was hit with shrapnel in his legs, which caused him to throw away his equipment and leave the fight. *Id.* ¶ 22. He did not fire actually his weapon. *Id.* Eventually, on or about February 27, 2019, Lirim Sylejmani surrendered himself and his family – his wife, Karolina, and his three children, I.S., H.S., and E.S. – to SDF forces. *Id.* ¶ 23. His family remains in a refugee camp in Syria.

In an interview with The New Yorker magazine, Mr. Sylejmani admitted joining ISIS and receiving training, but then accurately described his military activity as follows:

> I shot about twenty bullets when I was doing the training in Mosul. And I shot one bullet in a house, by accident, in the ceiling. That's as much fighting as I did,' Sulejmani insisted. 'I carried the gun since the first day when I came to Dar alIslamiyyah [House of Islam] until I left Baghouz. Towards the end it was rusted, but my goal wasn't to come fight. It was making hegira.

PSR ¶ 24 (quoting "The Dangerous Dregs of ISIS," *The New Yorker*). During a subsequent interview with the FBI, Lirim admitted that the contents of the article were true. PSR ¶ 25.

**Mr. Sylejmani's Medical Issues**

From February 27, 2019 to September 15, 2020, approximately 18 months, Mr. Sylejmani was held by the SDF forces in appalling conditions. As detailed in prior submissions to the Court, while in SDF custody, Mr. Sylejmani was routinely subjected to multiple beatings and humiliations, sleep deprivation, starvation, physical and psychological torture, and was repeatedly threatened with his death or the death of his family. *See* ECF Docket Nos. 52 and 57. By the time the FBI removed him from SDF custody on September 15, 2020, and repatriated him to the United States, Mr. Sylejmani was severely anemic, severely malnourished, and severely ill. *Id.* The first thing he asked the FBI on the military transport plane was to be given food and antibiotics. ECF

9

Docket No 52 at 10.

While in Syria, Mr. Sylejmani contracted lice, ringworm, and scabies. He experienced stomach pain and diarrhea so severe that he began bleeding from his rectum. He was so malnourished that he could no longer digest food properly, became anemic, developed acute edema, particularly in his legs and feet, and had symptoms of scurvy (including mouth sores and gums and teeth so soft and bloody that he needed to soak his bread in water before daring to chew it) and typhus (including fever, chills, skin rash, and delirium). Mr. Sylejmani became so weak from the beatings, torture, and lack of food and water, that he lost the ability to walk unaided and began experiencing auditory and visual hallucinations. *See* PSR ¶ 68; ECF Doc. No. 52 at 9 n.2.

His mistreatment and malnourishment in Syria have led to continuing acute and chronic medical issues for Lirim. According to his D.C. medical records, he suffers from several medical problems including painful cysts, rectal pain, hip pain, back pain, joint pain, abdominal pain, reflux disease, a benign tumor was located on the left parietal lobe of his brain (a particular concern given his family's cancer history), vitamin D deficiency, and hypertension. Sylejmani Medical Records (attached hereto as **Exhibit C**); PSR ¶ 68. He also has a history of positive tuberculosis skin tests, likely from his time in Syrian custody. *Id.*

**Mr. Sylejmani's Positive Adjustment to Prison**

Since September 2020, Mr. Sylejmani has been held in prison in the United States, most recently at the Correctional Treatment Facility in Washington, D.C. In those four plus years in custody, "Mr. Sylejmani has incurred no disciplinary infractions," Moreover, he has made productive use of his time in custody, successfully completing a series of educational courses as part of the Lead Up/Lead Out Program at his facility. *See* Certificates of Completion (attached

10

hereto as **Exhibit D**).[4]

Mr. Sylejmani's positive adjustment to prison further evidences his rehabilitation and shows he will succeed in integrating successfully into the community upon his release from prison.

**Mr. Sylejmani's Positive Future Plans**
**Upon Completion of His Prison Sentence**

Upon his release from prison, Lirim will live with his cousin Ramadan Suleymani is Bristol, Illinois and work in Ramadan's landscaping business. *See* PSR ¶ 65.

While Ramadan does not condone what Lirim did or the choices he made, Ramadan also understands Lirim is a good person who deserves a second chance. As Ramadan explains:

> Lirim has repented for his actions. No man I know feels more guilt and pain that he does. He knows that it was he who decided to go to Syria and as a result his wife and kids are in al-Hol refugee camp. He knows his children are paying for his mistakes.
>
> It is because I know that Lirim is a good person who regrets deeply his actions that I have an open door for him. I am a father of four children, and if I felt that he was in any way a burden or danger to my family or I, my home would not be open to him. I support Lirim in every possible way. I will also help him readjust to life as a civilian by helping him find a job. He can stay in my home as long as he needs to get back on his feet. I hope this letter stands as a symbol of my belief, love, and confidence in my cousin Lirim, and his ability and potential to live a productive life once released. I also think it is fair and vital for me to share some of my pain and frustrations endured through this process and note that despite this pain I am willing to help my cousin.

Ramadan Letter (Ex. A) at 7; PSR at 65 ("I know the Court does not know us, but I don't fear him being in my home and I don't believe he is a threat to anybody.").

Lirim's plans upon completing his sentence are simple. He intends to rebuild his life with

---

[4] "The Lead Up / Lead Out Program is designed to equip participants with essential leadership skills, professional development opportunities, and tools for success." Letter from Antoine Pugh, Lead Up/Lead Out Program Manager (attached hereto as part of Ex. D).

11

the help of his family and spend his days trying to make up for the harm he caused his wife and children. He will never reoffend.

## LEGAL DISCUSSION

The government, Probation, and Mr. Sylejmani all agree that the 10-year plus lifetime supervised release sentence stated in the plea agreement is "sufficient, but not greater than necessary, to comply with the purposes" of criminal sentencing set out in 18 U.S.C. § 3553(a)(2) – *viz*, "proportionality, deterrence, incapacitation, and rehabilitation." *See Pepper*, 562 U.S. at 493; *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017). Accordingly, the Court should impose that sentence on Mr. Sylejmani here.

One legal issue requires the Court's attention and determination. Although it is this Court that will impose the federal term of Mr. Sylejmani's imprisonment, 18 U.S.C. § 3582(a), it is the Bureau of Prisons (BOP) that will calculate the sentence and applies any applicable credits, 18 U.S.C. § 3585. In this regard, Program Statement (Prog. Stat.) 5880.28 serves as the BOP's "Sentence Computation Manual." *See* https://www.bop.gov/policy/progstat/5880_028.pdf. Under it subject to exceptions that do not appear applicable here, BOP policy states: "Credit will not be given for any portion of time spent serving another sentence, regardless of whether the sentence is federal, state, or foreign." Prog. Stat. 5880.28, at 1-17[5]; see also *Kendrick v. Carlson*, 995 F.2d 1440, 1444-47 (8th Cir. 1993) (upholding, under predecessor statute, BOP denial of custody credit for a foreign sentence). Thus, it is unlikely BOP will credit Mr. Sylejmani with the 18 months he served in the Syrian prison system when calculating the prison sentence imposed by the Court.

---

[5] https://www.bop.gov/inmates/custody_and_care/sentence_computations.jsp 3, available at https://www.bop.gov/policy/progstat/5880_028.pdf.

We respectfully submit that the Court can and should exercise its authority to remove this administrative ambiguity entirely, by adjusting the sentence imposed under USSG § 5G1.3(b)(1):

> [T]he court <u>shall</u> adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment if the court determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons.

USSG § 5G1.3(b)(1) (emphasis added).

As the above language shows, when applicable, the procedural requirement to make the § 5G1.3(b)(1) adjustment is mandatory – the Court "shall adjust the sentence" – though the Court retains discretion to vary above or below the post-adjustment sentence. *United States v. Winnick*, 954 F.3d 1103, 1104-05 (8th Cir. 2020) (explaining the required procedure step-by-step). In effect, this provision appropriately permits a sentencing court to give a defendant credit for prison time served under a related foreign offense and sentence.

In *Shkambi v. Garland*, 2023 WL 6383828, at *1 (N.D. Ohio Sept. 29, 2023), for example, the petitioner-defendant sought, prior to sentencing, "a downward departure from the Sentencing Guidelines because the same heroin on which his Albanian conviction was predicated was used to convict him here in the United States. The sentencing court agreed, and Petitioner was sentenced to 324 months imprisonment, which included a 36-month adjustment for time served on his Albanian conviction as provided by USSG § 5G1.3(b)." (record citations omitted)).

In this case, Mr. Sylejmani was held in a foreign prison for 18 months in entirely inhumane conditions for being an ISIS member. The Court should consider and credit that time in imposing its sentence. *See, e.g., United States v. Carty*, 264 F.3d 191 (2d Cir. 1991) (recognizing that conditions of confinement are relevant to the Court's sentencing determination.). In the alternative, the Court should recommend to the Bureau of Prisons to credit Mr. Sylejmani with that time. See, *United States v. Al Madioum*, 20 Cr. 196 (D, Ct

13

Michigan 2021).

## **CONCLUSION**

For the foregoing reasons, and such others as may be presented at the sentencing hearing, Mr. Sylejmani respectfully requests that the Court impose a sentence that is no greater than the 10-years imprisonment and lifetime supervision set forth in the plea agreement. Such a sentence meets all the goals of federal sentencing and fully accords with overarching parsimony principle that a sentence should be sufficient, but not greater than necessary, to comply with those sentencing goals.

Dated: May 23, 2025

                                               */s/*
                                      Sabrina P. Shroff
                                      80 Broad Street, 19th Floor
                                      New York, NY 10004

                                             */s/*
                                      Ubong Akpan
                                      Tyrees Smith (investigator)
                                      Office of the Federal Public Defender
                                      625 Indiana Ave, NW, Suite 550
                                      Washington, D.C. 20004

                                      *for Mr. Lirim Sylejmani*

Exhibits A-D